Tantum *v.* Green.

Tantum, appellant, and Green, respondent.

1. A judgment creditor who has exhausted his remedy by execution, may proceed against the choses in action of his debtor, and a court of equity will set aside a fraudulent assignment by the debtor of such choses in action, to enable the creditor to proceed against them.

2. Such creditor is entitled to have the mortgage debts due the judgment debtor collected by a receiver and applied to the payment of the judgment.

3. But it is not sufficient for the creditor simply to prove that the debtor made the assignment for the purpose of hindering, delaying, and defeating the collection of the judgment. He must show that the assignee participated in such fraudulent intent, or at the time he took the assignment had notice of facts and circumstances, from which the fraudulent intent of the assignor was a natural and legal inference.

4. If a purchaser has before him facts which should put him on inquiry, it is equivalent to notice of the fact in question, and where such fact constitutes a fraud on a third party, it will not protect the purchaser that he purchased for value.

The opinion of the Chancellor is reported in 4 *C. E. Green* 105.

*Mr. Robeson,* Attorney-General, for appellant.

*Mr. Kingman,* for respondent.

The opinion of the court was delivered by

Dalrimple, J.

The complainant having recovered a judgment against John A. Tantum, one of the defendants, in the Supreme Court of this state, and exhausted her remedy at law, filed her bill in chancery against the judgment debtor and his brother, Joseph R. Tantum, praying that certain assignments of mortgages, made by John to his brother, may be set aside as fraudulent against the complainant. The complainant's allegation is, that the assignments were not *bona fide,* but made with the fraudulent intent to hinder, delay, and defeat her in the collection of her claim.

It is not necessary in this case to decide whether, independent of the statute of 1845, (*Nix. Dig.* 116, § 81,) and the act to prevent fraudulent trusts and assignments, (*Ibid.* 297), a judgment creditor, after having exhausted his remedy at law, could maintain a bill in chancery to reach the choses in action of the judgment debtor, which are not subject to levy by virtue of an execution on the judgment. The case of *Swayze* v. *Swayze*, 1 *Stockt.* 280, only decides that a judgment creditor is not entitled to a decree setting aside a conveyance of real estate as fraudulent, where he does not show that he has exhausted his remedy at law, and where the judgment would have been no lien on the land if the fraudulent conveyance had not been made. The case of *Young* v. *Frier, Ibid.* 465, is to the effect that the complainants in that case being only creditors at large, had no standing in court and no right to question the claims of certain judgment creditors. I do not understand the learned Chancellor to decide in either of the cases referred to, that after a judgment creditor has exhausted his remedy by execution a court of equity cannot afford him its aid and enable him to reach the choses in action of his debtor. Chancellor Kent, in the case of *Bayard* v. *Hoffman*, 4 *Johns. C. R.* 450, in an elaborate review of all the law upon the subject, inclines to the opinion that a court of equity may, after the creditor has exhausted his remedy at law, come in aid of an execution and compel the application of the choses in action of the debtor fraudulently assigned, to the payment of the judgment. 1 *Story's Eq. Jur.*, § 368.

But however this may be, by the statute of 20th of March, 1845, and the act to prevent fraudulent trusts and assignments, a right is given to the judgment creditor who has exhausted his remedy by execution, to proceed against the choses in action of his debtor, in order to obtain satisfaction of the judgment. The complainant in this case alleges that by means of the fraudulent assignments, which she seeks to set aside, an obstacle to her proceeding against her debtor's choses in action has been created, and insists

that it is the duty of a court of equity to remove the obstacles thus created. It seems to me that there can be no doubt of the complainant's right to the relief she asks, provided the assignments are of the character alleged. The complainant is entitled to have the mortgage debts due her judgment debtor collected by a receiver and applied to the payment of the judgment. If the defendant in the judgment has fraudulently made an assignment of these mortgages with intent to hinder, delay, and defeat the complainant in collecting her debt, she has a right to have the fraudulent assignments removed out of her way. But it will not suffice for her to prove simply that the judgment debtor made the assignments for the purpose of hindering, delaying, and defeating the collection of the judgment; she must go further, and show that the assignee participated in such fraudulent intent, or at the time he took the assignments had brought to his notice facts and circumstances from which the fraudulent intent of the assignor was a natural and legal inference. If Dr. Tantum, the assignee, is not a *bona fide* holder for value, he has no title as against the complainant to the mortgages assigned. A decree pro confesso has passed against John A. Tantum. Dr. Tantum, the other defendant, has answered, and in terms denied any fraudulent intent, and says, in substance, that he took the assignments and advanced the money therefor, not to enable his brother to hinder or defeat his creditors, but on the representation that his brother desired to raise money to pay the complainant's claim and his other debts in New Jersey, preparatory to his leaving the state, and that in consideration of the assignments he in good faith paid the whole amount due on the mortgages. I think the answer thus far responsive to the bill. But if the facts and circumstances admitted by the answer, and in proof, show that this defendant must have known of the fraudulent intent of his brother, or if those facts and circumstances were such as to lead legitimately and naturally to the inference of fraudulent intent of the debtor, the assignments cannot, as against

the complainant, stand. What a person knows may be locked up within his own breast; what he should know from a prior state of facts, is a conclusion of law. If a purchaser has before him facts which should put him on inquiry, it is equivalent to notice of the fact in question.

Let us see under what circumstances Dr. Tantum took these assignments, and thus enabled his brother to convert all his available assets into cash and defraud the complainant of the amount of her judgment. The action of complainant against John A. Tantum was for breach of promise of marriage; and it is not denied that he had frequently declared his purpose not to pay any verdict which might be recovered against him, nor that *his* intent in making the assignments to his brother was to defeat the collection of the complainant's claim. The verdict in the suit at law was rendered at about ten o'clock of the night of the 7th of December, 1866, at Freehold. The defendant immediately thereupon left Freehold, passed through Allentown, where he resided, and the next day we find him in Camden, where he makes, executes, and acknowledges the assignments, puts upon them the stamps required by law, and proceeds to the residence of his brother at Wilmington, in the state of Delaware, where he arrives on the same day. He informed his brother that the complainant had obtained a verdict against him of near $3000, which, with the expenses incident to the suit, he would not be able to pay unless his brother would assist him in converting his mortgages into money, declaring that he wished to leave New Jersey and embark in business elsewhere, and that he desired to realize the money due on these mortgages to enable him to pay complainant and his other obligations in New Jersey; and as a further inducement to his brother to advance the money, offered to throw in a horse and wagon worth $350. Dr. Tantum accepted the offer, and on the following Monday, being the 10th of December, he paid the full amount of the mortgages, having to borrow $4000 of the amount, and on the same day, before complainant had

obtained judgment on her verdict, deposited the assignments in the clerk's offices of the counties of Mercer and Monmouth, in this state, to be recorded. Dr. Tantum knew of the pendency of the suit for breach of promise. Before the trial of that suit the defendant therein had married, and was at the time of the trial residing with his wife in a house belonging to her in Allentown, in this state. From the facts admitted to have been known by Dr. Tantum, one of two inferences could only have been legitimately drawn, either that John was anxious to dispose of his property, with intent to defraud the complainant, or that he was in distress to raise the money to pay complainant before she had even obtained a judgment. It was not a natural, reasonable, or probable inference, notwithstanding John's averment that he intended to pay the complainant, that he had the slightest intention of paying her. Dr. Tantum had no right to shut his eyes to all the surrounding circumstances tending in one direction, and rely on the unsupported statement of his brother that he intended no fraud, when a moment's reflection would have shown the contrary. Within twenty-four hours after the verdict, John had gone from Freehold to Wilmington, stopping on his way to have the assignments prepared, without knowing whether his brother would accept them or not—so anxious immediately to raise the money to pay a claim hitherto hotly contested, that he was willing to pay a bonus of $350 to turn the mortgages into cash; and to be sure that he would have cash enough in hand he proposed to assign securities to an amount of some $2000 in excess of the complainant's verdict, and scrupled not to have his brother borrow $4000 in order to raise the amount. Though the doctor says John told him he wanted to pay all claims against him in New Jersey and leave the state and engage in business elsewhere, it does not appear that he intimated what disposition he expected to make of his family and the property of his wife, nor where he expected to go, or in what business to engage. Before having any settled plans for the future, before having been

called upon by execution or otherwise to pay the verdict, his hurried departure from home and his anxiety to dispose of his mortgages at a sacrifice, under the pretence of a desire to pay with such unusual promptitude a claim the justice of which it does not appear he has ever admitted, were circumstances clearly showing fraudulent intent, no matter how many solemn asseverations he made to the contrary. If Dr. Tantum, blinded by his over confidence in his brother, failed to see the transaction as it would have presented itself to any prudent business man, upon him and not the complainant must fall the loss. It also appears in the case that very soon after the transaction was closed the doctor conceived some suspicion of the good faith of his brother, for we find that he took or sent the assignments the same day they were delivered to him to the proper clerks' offices to be recorded. Why this prompt action, unless at that early period, within a very short time after the money had been paid, the doctor feared that John did not intend to appropriate the money as he had declared he would? The fair inference is, that thus early, in order to secure the mortgages against the claims of creditors, the doctor thought it prudent to have the assignments recorded without delay. If his suspicions had been awakened a few hours earlier it would have saved him from a loss which, judging from his answer, it would appear must be inevitable, unless his brother will make good his declared intention of paying the complainant's claim.

The conclusion to which I have come is the same as that arrived at by the Chancellor, that though Dr. Tantum may not have had such knowledge of the intended fraud as to make his denial thereof perjury, yet he had notice of suspicious, unusual, and extraordinary circumstances, which should have put him on inquiry. That he paid full consideration for the assignments will not suffice. He must not only be a purchaser for value, but a *bona fide* purchaser without notice of the fraudulent intent of the assignor, or of cir-

cumstances which should have put him on inquiry, and which were equivalent to notice.

The decree of the Chancellor must be in all things affirmed, with costs.

*For affirmance*—BEASLEY, C. J., BEDLE, DALRIMPLE, DEPUE, KENNEDY, OGDEN, OLDEN, VAIL, VAN SYCKEL, WOODHULL.   10.

*For reversal*—NONE.