HENRY (in the will called Heinrich) STEIN et al., &c., complainants-respondents,

*v.*

WILLIAM WITTMER et al., &c., defendants-appellants.

[Submitted October term, 1934.   Decided January 10th, 1935.]

536

On appeal from a decree of the court of chancery advised by Vice-Chancellor Fielder, who delivered the following opinion:

"The bill is filed to foreclose a purchase-money mortgage dated July 7th, 1921, made by defendants William and Frederick Wittmer to Ludwig F. Seggel, the complainant's testator, to secure the payment of $20,000, July 1st, 1924, with six per cent. interest. The mortgaged premises had been conveyed by Seggel to the defendants by full covenant and warranty deed, free of all encumbrances but 'subject to the rights of a monthly tenant now in occupation of a part of the premises.' The defense here is that tenant, Spiegel, was not a monthly tenant; that the defendants were put to expense in endeavoring to remove him from the premises; that he held possession until October 1st, 1925; that the defendants lost the value of the use and occupation of the portion of the premises held by Spiegel and that they are entitled to credit on the mortgage debt for $15,000 for dam-

ages sustained by them through the breach of Seggel's covenants of quiet possession and against encumbrances and for $1,500 for legal expenses incurred in endeavoring to oust Spiegel.

"Seggell had executed a lease to Spiegel for part of the mortgaged premises, dated September 15th, 1915, to run for five years from October 1st, 1915, containing an option to the lessee for a five-year renewal on notice and also an option to purchase, on notice, at the expiration of the lease. The lease was promptly recorded. At the time of conveyance by Seggel to defendants, Spiegel was in possession of the portion of the premises covered by his lease and it was Seggel's contention that Spiegel had given no notice of intention to renew the lease; that his tenancy had expired October 1st, 1920, and that Spiegel was holding under an oral monthly tenancy agreement with Seggel made after the expiration of his lease, whereby he agreed to quit on three months' notice. When negotiations between Seggel and the defendants for the purchase of the property had arrived at the stage of agreement prior to July 1st, 1921, Seggel had an understanding with Spiegel that the latter would vacate the premises by October 1st, but out of precaution Seggel employed Mr. Ockford, a member of the bar of this state, who knew the terms of the lease between Seggel and Spiegel, to prepare and serve on Spiegel a notice to quit on or before October 1st, which notice was duly served prior to July 1st. The defendants then employed Mr. Ockford to represent them in the purchase of the property and he thereafter acted as their attorney. Mr. Ockford explained to the defendants the situation with regard to Spiegel's tenancy and it seems to have been the belief of all that Spiegel was holding possession as a monthly tenant and would vacate by October 1st. Seggel's deed to the defendants was passed upon and accepted by Mr. Ockford and their purchase-money mortgage to Seggel was delivered.

"Spiegel refused to vacate October 1st, 1921. He then claimed he had given proper notice for renewal of his lease for five years from October 1st, 1920, and that his possession was under such notice, without a written lease. October

6th, 1921, the defendant commenced suit in ejectment against Spiegel and the case came on for trial March 1st, 1922, and resulted in a verdict that Spiegel was entitled to possession. Judgment *nisi* was entered and a rule to show cause for a new trial was granted which, by agreement between counsel, was never argued and, by stipulation filed June ·27th, 1928, the suit was formally discontinued. After the verdict Spiegel paid the defendants his arrears of rent and continued to pay rent monthly until he vacated, which payments were made and accepted without prejudice to either party.

"In May, 1922, the defendants brought suit in this court against Spiegel to (in effect) cancel his lease but no proceedings were .taken therein after answer filed. At the time Spiegel was under suspicion, or charges, of selling liquor illegally and I gather that that suit was brought to protect the Wittmers against possible padlock proceedings rather than with the expectation of ejecting Spiegel from the premises.

"A controversy between the defendants and Seggel arose out of Spiegel's continuing in possession and over the defendant's claim that Seggel should pay the expenses of attempting to dispossess him and the defendants demurred to paying interest on their mortgage. Seggel insisted that Spiegel had no right to possession and declined to pay any part of the expense and demanded payment of interest on his mortgage. He was living in Germany when the defendants' suit for ejectment against Spiegel was commenced and tried and was not a party to or witness in that suit. That he had the evidence which probably would have resulted in a judgment in ejectment against Spiegel had his testimony been taken by commission, appears from the following facts. In October, 1925, Spiegel filed a bill in this court against Seggel and the Wittmers praying specific performance of the option to purchase reserved to him in the lease of September 15th, 1915, claiming that he had given due notice of intention to exercise said option to purchase. After a hearing, at which Seggel's deposition taken in Germany was read, this court found that the lease between Seggel and Spiegel had terminated

October 1st, 1920, by consent of the parties thereto; that Spiegel had continued in possession as a monthly tenant under a verbal lease from Seggel; that he was not entitled to exercise his option to purchase, and his bill of complaint was dismissed.

"The controversy between the defendants and Seggel as to Seggel's liability continued, Seggel still denying liability for the defendant's failure to disposses Spiegel and for damage suffered or expense incurred by the defendants. Seggel had gone to Germany in June or August, 1921, for a visit. He was then about seventy-seven years of age and his eyesight was failing. His brother resided in Germany and upon his persuasion Seggel remained there and died May, 1932. The defendants were slow in payment of interest on several occasions and being in default January 1st, 1924, the matter was placed in the hands of Seggel's attorneys. The mortgage, by its terms, was to mature July 1st, 1924, and after much correspondence between the attorneys for the parties, in April of that year the defendants' attorney wrote Seggel's attorneys offering to settle the dispute between the defendants and Seggel if the latter would allow a credit of $2,500 on the mortgage, in which event the defendant would arrange to pay the balance due, to which the reply was that Seggel would not consider a compromise and would insist on payment of principal and interest in full on the due date of the mortgage, together with a large sum which Seggel claimed was due him on the sale of Seggel's business to the defendants and on July 1st, 1924, Seggel's attorneys notified defendants' attorney that in default of payment of the mortgage, foreclosure would be instituted at once. Some further negotiations must have ensued between the attorneys because the defendants' attorney prepared an extension of mortgage agreement which he sent August 27th, 1924, with a check for $600, interest due July 1st, 1924, to Seggel's attorneys with request that they have Seggel execute it. The agreement was subsequently executed by the parties in duplicate under date of September 15th, 1924. It provides for the extension to July 1st, 1929, of payment of the full amount

of the mortgage with interest at six per cent. and thereby the defendants promised, in consideration of the extension, to pay the principal and interest in full without any claim, deduction, set-off, recoupment or counter-claim by reason of any breach or alleged breach of the covenant against encumbrances contained in the deed from Seggel to the defendants, or by reason of any matter or thing arising in connection with Spiegel's tenancy of the premises therein described.

"Thus it would seem that the claims which defendants now make for credit on their mortgage were withdrawn and abandoned and that on the faith of their waiver, Seggel was induced to withhold demand for payment of his then due mortgage debt and give the defendants five years further time in which to make payment. But the defendants now say that the agreement was usurious, illegal and contrary to the statute, in that it reserved to Seggel the entire amount of principal, with interest at the full legal rate and required the defendants to forego a claim against Seggel which they now contend amounted to $15,000.

"The burden of proof to show usury is on the defendants and they must prove that their waiver of claim for damages, which is recited as consideration for the extension of mortgage. was the result of a corrupt bargain to contravene the statute. *Muir* v. *Newark Savings Inst.*, 16 N. J. Eq. 537; *Gillette* v. *Ballard*, 27 N. J. Eq. 489; *Kase* v. *Bennelt*, 54 N. J. Eq. 97; *Dunlap* v. *Chenoweth*, 88 N. J. Eq. 496. If they have sustained that burden it is settled that a subsequent payment of premium to secure an extension of time for the payment of a mortgage originally free from usury does not render it usurious but the premium should be credited as a payment on the mortgage as of the time it was paid. *Ruh* v. *Dwiggins*, 77 N. J. Eq. 117; *Lillig* v. *McGarrity*, 107 N. J. Eq. 147; affirmed, 109 N. J. Eq. 130. But it is not enough that the circumstances proved may even render it highly probable that there was a corrupt bargain; such a bargain must be proved beyond a reasonable doubt. *Taylor* v. *Morris*, 22 N. J. Eq. 606; *Berdan* v. *Trustees of School District No. 38, &c.,*. 47 N. J. Eq. 8; affirmed, 48 N. J. Eq.

*309; Norton* v. *Nathanson, 85 N. J. Eq. 409; affirmed, 86 N. J. Eq. 433.*

"Under the extension the mortgage fell due July 1st, 1929, but Seggel, evidently believing that the controversy over the amount due thereon had been definitely settled, was willing to permit it to run so long as interest was paid promptly and it was paid regularly up to the time of his death. He had asserted a claim against the defendants for money due on the sale of his business to them, which claim he might have established had they resisted payment of their mortgage on its original due date. While the extension agreement does not contain a release of his claim, his failure to again assert it is evidence that he waived it as part of the settlement between him and the defendants. Even were that claim not now barred by the statute of limitations, the evidence to establish it is lost by his death. It was after his death that the defendants first made claim that the terms of the extension agreement were usurious. Thus for eight years the defendants paid interest quarterly without objection or protest, when they could have forced the issue of usury on any interest day, but they chose to wait until Seggel's death. When the aid of this court is sought on the ground of usury, the court will not only search the evidence to ascertain whether the offense has been committed but will take care to determine whether the charge is made in good faith, or as an expedient seized upon to escape liability. These defendants knew that Seggel was advanced in years and that his demise could not be far off. They could have attempted in his lifetime to impeach their solemn agreement that they would not present the defense they now urge against his mortgage, but they chose to abide by the agreement until he could not be heard in support of the fairness and *bona fides* of its terms and therefore their defense does not appeal favorably to the court.

"I have recited at some length the facts which led up to the extension agreement and therefrom it appears that Seggel steadfastly denied liability for the damages claimed by defendants and he certainly had substantial ground for his position. The question here is not so much whether the

defendants had a valid claim against him, but whether Seggel regarded the claim as of value and used the extension as a means of compelling the defendants to surrender it. If the defendants felt that they had the valid claim which they now say amounted to $15,000, they were in a position to establish it in Seggel's lifetime, by refusing to pay the mortgage debt when it fell due and thus force Seggel to a foreclosure suit, wherein they could have counter-claimed as they have here. There is no evidence to show what led up to the preparation of the extension as it came from the hands of the defendants' attorney, or who suggested the provision which he inserted therein for waiver of the defendants' claims. It does not appear that the offer of extension came from Seggel or that he exacted the agreement from the defendants in pursuance of an unlawful and corrupt purpose of obtaining from the defendants something he considered of value. There is no evidence that the defendants were in such financial straits that they were compelled to agree to harsh and usurious terms to obtain the extension and thus save their property from foreclosure. If they could have established their claim then, they had but $5,000 to pay and surely, if they had not the funds at hand, that sum could have been raised on a new mortgage. But they were in a position to pay, because their attorney said in a letter under date of April 29th, 1924, that if Seggel would allow a credit of $2,500 on the mortgage, they would make the necessary arrangements to pay off the balance. There appears to be no doubt but that at the time of the extension of mortgage the defendants were entirely free to exercise their judgment whether to appeal to the law to establish their disputed claim, or to surrender it and there is nothing to show that they surrendered it under pressure brought by Seggel with the purpose of obtaining thereby an unjust profit. True, the withdrawal of defendants' claim may have been a factor which induced Seggel to grant the extension but it does not appear that it brought the extension about. For more than two years he had denied liability to the defendants and he may well have agreed to the extension as a means of disposing of a controversial subject, or of

avoiding the expense of litigation in defending against it, just as the defendants may have determined to surrender a claim of doubtful value, rather than speculate on their ability to establish it in court.

"It is my conclusion that by the extension agreement the defendants released and surrendered the claims they now assert and are estopped from urging them and that the proofs fall far short of establishing that the agreement was the result of a corrupt bargain entered into by Seggel to evade the statute against usury. I shall advise a decree dismissing the defendants' counter-claim and ordering sale of the mortgaged premises to raise the full principal amount of the mortgage, with interest in arrear thereon."

*Mr. John Drewen* and *Mr. Randolph Perkins*, for the appellants.

*Messrs. Wall, Haight, Carey & Hartpence* (*Mr. John A. Hartpence* and *Mr. William W. Shaw*, of counsel), for the respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion of Vice-Chancellor Fielder, delivered in the court of chancery.

*For affirmance*—THE CHIEF-JUSTICE, PARKER, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, JJ. 13.

*For reversal*—None.